

# Fourth Court of Appeals
## San Antonio, Texas

### MEMORANDUM OPINION

No. 04-23-00105-CV

**IN THE INTEREST OF C.D.L.**

From the 285th Judicial District Court, Bexar County, Texas
Trial Court No. 2021-PA-01955
Honorable Christine Vasquez-Hortick, Judge Presiding

Opinion by:    Liza A. Rodriguez, Justice

Sitting:    Rebeca C. Martinez, Chief Justice
Liza A. Rodriguez, Justice
Sandee Bryan Marion, Chief Justice (Ret.)[1]

Delivered and Filed: July 10, 2024

AFFIRMED

Mother and Father[2] appeal the trial court's order terminating their parental rights to their son C.D.L. On appeal, they argue the evidence is legally and factually insufficient to support the trial court's predicate and best-interest findings. Father also argues he was denied effective assistance of counsel. We affirm.

### BACKGROUND

In 2021, Mother was an elementary school teacher, and Father was a massage therapist. They were common-law married for about three years. Together they had one child, C.D.L., who

---

[1]Sitting by assignment pursuant to section 74.003(b) of the Texas Government Code
[2]To protect the identity of the minor child, we refer to the parties by fictitious names, initials, or aliases. *See* TEX. FAM. CODE § 109.002(d); TEX. R. APP. P. 9.8(b)(2).

was born in March 2021. Mother also had a twelve-year-old daughter from a previous relationship who lived with them.

On November 6, 2021, Mother and Father took seven-month-old C.D.L. to Methodist Hospital because of C.D.L.'s swollen leg. After x-rays were performed, Mother and Father were asked by the treating doctor whether they knew about any other fractures that C.D.L. had. Mother and Father replied they did not. Mother testified she had only noticed C.D.L.'s swollen leg that day or the day before. Mother was told by the treating physicians that C.D.L.'s injuries had occurred at different times. Mother testified that she was very surprised by this information and cried when she was informed. At the time, she was living with Father and her older daughter. She did not believe Father had caused the injuries. She and Father stayed with C.D.L. while he was at the hospital.

On November 12, 2021, the Department of Family and Protective Services ("the Department") filed the underlying suit to terminate Mother's and Father's parental rights to C.D.L., along with an affidavit in support of C.D.L.'s emergency removal. C.D.L. was removed and placed under the care of the Department. After a bench trial, the trial court terminated Mother's and Father's parental rights pursuant to section 161.001(b)(1)(D), (E), and (O) of the Texas Family Code. The trial court also found that termination of their parental rights was in C.D.L.'s best interest and named the Department as permanent managing conservator. Mother and Father appealed.

## SUFFICIENCY OF THE EVIDENCE

### A. Standard of Review

To terminate parental rights pursuant to section 161.001 of the Texas Family Code, the Department has the burden to prove by clear and convincing evidence that parental rights should be terminated pursuant to one of the predicate grounds in subsection 161.001(b)(1) and that

termination of parental rights is in the best interest of the child. TEX. FAM. CODE § 161.001(b)(1), (2). In reviewing the legal sufficiency of the evidence to support these findings, we look "at all the evidence in the light most favorable to the finding to determine whether a reasonable trier of fact could have formed a firm belief or conviction that its finding was true." *In re J.O.A.*, 283 S.W.3d 336, 344 (Tex. 2009) (quoting *In re J.F.C.*, 96 S.W.3d 256, 266 (Tex. 2002)). In reviewing the factual sufficiency of the evidence, we consider disputed or conflicting evidence. *Id*. at 345. "If, in light of the entire record, the disputed evidence that a reasonable factfinder could not have credited in favor of the finding is so significant that a factfinder could not reasonably have formed a firm belief or conviction, then the evidence is factually insufficient." *Id*. (quoting *In re J.F.C.*, 96 S.W.3d at 266). Under these standards, the factfinder is the sole judge of the weight and credibility of the evidence. *Id*.

### B. Subsections (D) and (E)

Subsection (D) allows termination of parental rights if, along with a best-interest finding, the factfinder finds by clear and convincing evidence that the parent "knowingly placed or knowingly allowed the child to remain in conditions or surroundings which endanger the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(D). "A child is endangered when the environment creates a potential for danger that the parent is aware of but consciously disregards." *In re C.J.G.*, No. 04-19-00237-CV, 2019 WL 5580253, at *2 (Tex. App.—San Antonio Oct. 30, 2019, no pet.) (quoting *In re S.R.*, 452 S.W.3d 351, 360 (Tex. App.—Houston [14th Dist.] 2014, pet. denied)).

Subsection (E) allows termination of parental rights if the trial court finds by clear and convincing evidence that the parent "engaged in conduct or knowingly placed the child with persons who engaged in conduct which endangers the physical or emotional well-being of the child." TEX. FAM. CODE § 161.001(b)(1)(E). Under subsection (E), the trial court must determine

"whether there is evidence that a parent's acts, omissions, or failures to act endangered the child's physical or emotional well-being." *In re C.J.G.*, 2019 WL 5580253, at *2.

Under both subsections (D) and (E), "endanger" means "to expose a child to loss or injury, or to jeopardize a child's emotional or mental health." *Id*. at *3 (citing *In re M.C.*, 917 S.W.2d 268, 269 (Tex. 1996)). "[A] parent need not know for certain that the child is in an endangering environment; awareness of such a potential is sufficient." *Id*. at *2 (quoting *In re R.S.-T.*, 522 S.W.3d 92, 109 (Tex. App.—San Antonio 2017, no pet.)) (alteration in original). "Under subsection (D), a trial court considers 'evidence related to the environment of the children to determine if the environment was the source of endangerment to the children's physical or emotional well-being.'" *In re J.A.B.*, No. 04-23-00907-CV, 2024 WL 1421986, at *2 (Tex. App.—San Antonio Apr. 3, 2024, pet. filed) (quoting *In re J.T.G.*, 121 S.W.3d 117, 125 (Tex. App.—Fort Worth 2003, no pet.)). "Conduct of a parent in the home can create an environment that endangers the physical and emotional well-being of a child." *Id*. (quoting *In re J.T.G.*, 121 S.W.3d at 125). "For example, abusive or violent conduct by a parent or other resident of a child's home may produce an environment that endangers the physical or emotional well-being of a child." *Id*. (quoting *In re J.T.G.*, 121 S.W.3d at 125). "Parental and caregiver illegal drug use and drug-related criminal activity likewise supports the conclusion that the children's surroundings endanger their physical or emotional well-being." *Id*. (quoting *In re J.T.G.*, 121 S.W.3d at 125). "Similarly, under subsection (E), '[a]n endangerment finding often involves physical endangerment, but the statute does not require that the parent's conduct be directed at the child or that the child suffer actual injury.'" *Id*. (quoting *In re K.J.G.*, No. 04-19-00102-CV, 2019 WL 3937278, at *5 (Tex. App.—San Antonio Aug. 21, 2019, pet. denied)) (alteration in original). "Rather, the specific danger to the child's well-being may be inferred from the parent's misconduct alone." *Id*. (quoting *In re K.J.G.*, 2019 WL 3937278, at *5). "Conduct that subjects a child to a life of uncertainty and

instability endangers the physical and emotional well-being of a child." *Id*. (quoting *In re K.J.G.*, 2019 WL 3937278, at *5). "Thus, evidence of illegal drug use by a parent and its effect on a parent's life and her ability to parent may establish an endangering course of conduct under subsection (E)." *Id*. (quoting *In re K.J.G.*, 2019 WL 3937278, at *5).

"While 'endanger' has the same definition under both subsections (D) and (E), 'there are some distinctions in the application of subsections (D) and (E).'" *In re J.A.B.*, 2024 WL 1421986, at *3 (quoting *In re C.J.G.*, 2019 WL 5580253, at *3). "Termination under subsection D may be based upon a single act or omission." *Id*. "In contrast, termination under subsection E 'may not rest on a single act or omission; it must be a voluntary, deliberate, and conscious course of conduct.'" *Id*. (quoting *In re C.J.G.*, 2019 WL 5580253, at *3). Additionally, "[i]n evaluating endangerment under subsection D, we consider the child's environment *before* the Department obtained custody of the child." *In re C.J.G.*, 2019 WL 5580253, at *3 (quoting *In re S.R.*, 452 S.W.3d at 360) (emphasis added). "Under subsection E, however, courts may consider conduct both *before* and *after* the Department removed the child from the home." *Id*. (quoting *In re S.R.*, 452 S.W.3d at 360) (emphasis added).

Mother and Father argue, respectively, that the evidence is legally and factually insufficient to support any finding that they endangered C.D.L. Mother argues that the evidence shows she properly cared for C.D.L. by taking him to medical appointments with his pediatrician. Similarly, Father argues that no evidence was presented showing that he knowingly or accidentally endangered C.D.L. and that the evidence shows the contrary finding—that he properly cared for C.D.L.

"A child's unexplained, non-accidental fractures of various ages support a reasonable inference that the child's caregivers knew of the injuries and their cause, and supports termination under subsection D." *In re L.M.M.*, 522 S.W.3d 34, 45 (Tex. App.—Houston [1st Dist.] 2017, pet.

denied) (quoting *In re J.D.*, 436 S.W.3d 105, 114 (Tex. App.—Houston [14th Dist.] 2014, no pet.)); *see also In re E.A.R.*, 583 S.W.3d 898, 909 (Tex. App.—El Paso 2019, pet. denied) (same); *In re T.B.*, No. 09-20-00172-CV, 2020 WL 6787523, at *8 (Tex. App.—Beaumont Nov. 19, 2020, no pet.) ("A history of repeated injuries to a child, even if unexplained, supports an inference that the child's caregivers allowed the child to remain in surroundings that endangered his physical well-being, that the parent knowingly failed to ameliorate the underlying cause, and a finding of endangerment."). Similarly, courts have held that a child's unexplained, non-accidental fractures of various ages can support an endangerment finding under subsection (E). *See In re E.A.R.*, 583 S.W.3d at 912; *In re J.D.*, 436 S.W.3d at 116; *In re T.B.*, 2020 WL 6787523, at *9; *see also In re D.P.*, No. 09-22-00048-CV, 2022 WL 2975691, at *9-10 (Tex. App.—Beaumont July 28, 2022, pet. denied) (holding evidence legally and factually sufficient to support termination under subsections (D) and (E) where medical evidence showed that children had multiple injuries at various stages of healing, which were non-accidental and consistent with child abuse).

In holding the evidence was legally and factually sufficient to support an endangerment finding under subsection (D) or subsection (E), courts have pointed to evidence from medical providers regarding the types of injuries suffered by the child and their stages of healing and whether the injuries were inconsistent with the parents' explanation or lack of explanation. *See In re J.D.*, 436 S.W.3d at 111, 116 (emphasizing medical testimony that the history given by the mother was not consistent with the injuries sustained by the child); *C.H. v. Tex. Dep't of Fam. & Protective Serv.*, 389 S.W.3d 534, 541 (Tex. App.—El Paso 2012, no pet.) (pointing to evidence that child suffered multiple injuries at different stages of healing). Courts have also pointed to evidence that the parents were the primary caregivers of the child for most or all the time and to evidence that the child did not continue to suffer injuries after being removed from the parents. *See In re J.P.B.*, 180 S.W.3d 570, 574 (Tex. 2005) (emphasizing parent was with child every day

of the four-week period during which child suffered multiple fractures, which were likely caused by "yanking, pulling, or punching"); *In re L.M.M.*, 522 S.W.3d at 45 ("Given that Mother was [child]'s primary caregiver, these unexplained ongoing injuries alone are some evidence to support termination under subsection (D)."); *C.H.*, 389 S.W.3d at 541 (noting that child sustained no more injuries while in foster care).

### 1. The Evidence

At trial, there was evidence that when seven-month-old C.D.L. was treated at the emergency room, his treating physician found over thirty fractures to his ribs, arms, and legs in various stages of healing. Dr. Natalie Kissoon, a child abuse pediatrician with Center for Miracles, responded to the hospital's request to examine C.D.L. and interview his parents. She testified that when asked, neither Mother nor Father could provide a reasonable explanation for C.D.L.'s injuries. They said only that C.D.L. was in a "bouncy."

Mother acknowledged at trial that when she took C.D.L. to the emergency room for his swollen leg, the hospital made her aware of the other fractures suffered by C.D.L., including one on the arm, one on the leg, and one on the ribs. She could not recall where the other fractures were located. She testified that she was later made aware C.D.L. had suffered up to thirty-two broken bones or fractures. She further acknowledged that while at the hospital, she had been informed C.D.L.'s injuries were at different stages of healing, to which she testified she had been "very surprised and cried." According to Mother, she had taken C.D.L. to the pediatrician at regular intervals, and both she and Father had raised concerns to the pediatrician about C.D.L., particularly about C.D.L. "not being able to move" at the same age as her daughter. Mother testified that both she and Father had also told the pediatrician that they were worried about busted blood vessels in C.D.L.'s eyes and "little red dots on his neck and his face [that] started popping out." Mother explained that as a result of that visit, they took C.D.L. for lab work, which came back normal.

Mother also testified that on September 17, 2021, they took C.D.L. to the pediatrician and raised concerns about teething and him being uncomfortable. According to Mother, before she took C.D.L. to the emergency room, he did not show any indication of having pain in his arms. Mother acknowledged there were times C.D.L. would not use his arms, which she also mentioned to the pediatrician, but she was told maybe C.D.L. was having a "late start."

Mother had no explanation for C.D.L.'s injuries found at the hospital except that while C.D.L. was in the "bouncy" that morning or the day before, he did not appear to be putting any pressure on his leg. She described the bouncy as one that stands on its own, has little toys to play with, and has a seat that rotates 360 degrees. Mother testified that C.D.L. would play with the toys on the bouncy and would, at times, get his arm stuck "in between the toys" when putting himself in a certain position. Mother described the bouncy as having three levels, and she explained that at the time "it was on the first level for [C.D.L.] to be able to have his feet touching the ground." She testified that sometimes a blanket was placed underneath the bouncy to give C.D.L. a little more support. Mother also described a battery-operated swing that C.D.L. would sometimes use. She explained that she sometimes had problems with the swing's seat.

Mother testified that at the time of C.D.L.'s injuries, she and Father were the primary caregivers, with C.D.L.'s maternal grandmother helping sometimes and keeping C.D.L. overnight about three or four times. According to Mother, other than the "eye thing and his neck," C.D.L. did not demonstrate any pain or concerning behaviors. Mother testified that C.D.L. did not attend any daycare facility and that either she or Father supervised her twelve-year-old daughter's interactions with C.D.L. Later, during cross-examination, Mother clarified that within the two-week period prior to taking C.D.L. to the hospital, he was left alone with his maternal grandmother at least once.

Mother signed a service plan and completed a parenting class, individual counseling, and a psychological test. She also attended all court hearings. She acknowledged that C.D.L. sustained "multiple broken bones or fractures" and that those injuries occurred at different periods of time while C.D.L. was under her and Father's care. However, she denied causing C.D.L.'s injuries and testified that she did not believe Father caused the injuries.

During cross-examination by her attorney, Mother remembered an incident in August 2021 where Father fell down the stairs while holding C.D.L. She testified that they did not take C.D.L. to the doctor because he seemed fine and not in pain and that she never reported this incident to anyone. Upon questioning by the court, Mother acknowledged that this was the first time she had mentioned the fall Father had with C.D.L. in August 2021 and thus it was "brand new information" to everyone.

Mother testified that a conviction for child abuse would affect her employment as an elementary school teacher, but she did not believe an allegation alone would affect her employment. She agreed that C.D.L.'s injuries occurred while he was in her care but felt more tests could have been performed at the hospital. Mother also testified that she was about fifteen weeks pregnant and had no plans to separate from Father.

Father testified that he was the primary caregiver for C.D.L. for the month of May 2021 while Mother was teaching as an elementary teacher, and then again beginning in August 2021 until C.D.L. was removed by the Department in November 2021. Father testified that because Mother was a schoolteacher and had to get up early for work, he would stay up at night with C.D.L. When asked whether he took breaks from caring for C.D.L., Father replied that he and Mother would "switch on and off every day." According to Father, from the period of August 2021 to November 2021, Mother was the primary caregiver for "at least an hour and a half at night."

Like Mother, Father testified that they originally took C.D.L. to the emergency room for a swollen leg. Once there, he testified that the nurses thought C.D.L. "probably [had] a bug bite or something." According to Father, once the x-rays came back, he and Mother were informed that C.D.L.'s leg was fractured. He testified that the treating physician then decided to conduct x-rays of C.D.L.'s entire body, which resulted in the discovery of a "couple more fractures." Father testified that he and Mother were informed only of "three other fractures at the hospital" and "were never notified of any other fractures." He acknowledged that he and Mother were informed that the injuries appeared to have occurred at different times. According to Father, before taking C.D.L. to the emergency room, he had noticed C.D.L. was favoring one leg over the other when placed in the "bouncy."

Father testified to having completed all the services on his service plan, including individual counseling, a parenting class, couples counseling, a drug evaluation, a psychological evaluation, and a psychiatric evaluation. He understood that according to his service plan, he was to discuss "why the child came into care, [and provide a] credible explanation as to how the child sustained fractures and his current situation." Father testified that he did not know how C.D.L. sustained his injuries. Father denied having caused C.D.L.'s injuries and did not believe that Mother caused them either. Father testified he was not aware of any "physiological condition" that would cause C.D.L.'s bones to "spontaneously fracture or break."

Both parents testified that they requested copies of the x-rays and the Center for Miracles report from the Department but were never given the x-rays or the report. According to Father, he was told the doctors had run tests but all the tests had come back negative. Father testified that he was also asked about any family history of any conditions or disorders but only indicated the conversation was not extensive.

With regard to Father's explanation of C.D.L.'s injuries, Father testified that on August 31, 2021, he and C.D.L. were at home. Father testified,

> C.D.L. woke up, and I went to his room and picked him up, and I wanted to go take him downstairs to get him his bottle ready, and my back was hurting. And so, you know, as I'm walking down the steps, I don't know if I meant to—had a misstep or what, but I got a sharp pain in my legs, and I slid down the stairs, and while I was holding [C.D.L.] walking down the stairs, I tried to grab—I tried to grab the rail so I didn't fall with him and—and I made sure I fell on my back, and I just fell and held on to him.

Father further testified that when he fell, he leaned back and tried to grab the rail. He fell on his back, and C.D.L. was on his chest. Father testified that he was scared and walked down the stairs to the living room to check C.D.L. He took off C.D.L.'s clothes and checked all over his body. According to Father, C.D.L. was crying at first, but stopped. Father believed C.D.L. was just scared and did not scream like he was hurting. Father testified that after looking over C.D.L., he determined C.D.L. was fine. Father tried to call Mother and sent her a text. Father testified that he later mentioned the fall to the pediatrician at the September 17, 2021 visit, and the pediatrician conducted a full physical of C.D.L. According to Father, the pediatrician said that "there's nothing wrong, he's perfectly fine."

Father testified that if he believed either Mother or his mother-in-law was responsible for the injuries, he would have "definitely report[ed] it." He testified that he did not know how C.D.L. sustained the injuries, that he did not hurt C.D.L., and that he did not believe Mother's daughter, Mother, or Mother's parents hurt C.D.L.

Father testified that his understanding why the Department concluded he was not in compliance with his service plan was because he did not admit to harming his son or having knowledge of anyone else harming his son. Father also stated that it was his understanding that the reason the Department was seeking to terminate his parental rights was because he did not provide a reason that the Department found sufficient to explain how C.D.L. sustained his injuries.

Dr. Kissoon testified that she was called to evaluate C.D.L. because, after finding thirty fractures, the hospital was concerned about possible child maltreatment. She completed a medical evaluation, which included "taking a full history, doing a full physical exam, reviewing any laboratory results and imaging results that were present, and then forming an assessment based on [that] information." By the time she saw C.D.L., a CT scan had been done. She also recommended an abdominal CT in order to determine whether there were any additional injuries and whether there was any need for further medical intervention. Labs were also ordered. According to Dr. Kissoon, the CT scan showed multiple fractures, and the lab work ruled out any possible medical causes, nutritional causes, and genetic causes for the injuries. Dr. Kissoon testified that an endocrinologist (a physician who deals with the metabolic processes of the body) was also consulted to determine whether there was any underlying metabolic bone disease. After reviewing the endocrinology report, Dr. Kissoon determined C.D.L. was injured through abuse.

According to Dr. Kissoon, genetic testing for osteogenesis imperfecta (OI) was also conducted, and the results were negative. Additionally, Dr. Kissoon reviewed medical records from C.D.L.'s pediatrician. In those records, the pediatrician had made a note during C.D.L.'s six-month visit, discussing "a concern that the night before [C.D.L.] had developed red spots or petechiae on his face." The medical records reflected that "laboratory tests were done to evaluate for underlying bleeding disorder," but nothing was found. Dr. Kissoon testified that "petechiae are small pinpoint bruises that happen because the superficial blood vessels or capillaries burst." Dr. Kissoon explained that one can "get petechiae from blunt impact, as well as from restricted blood flow, as [one] might see especially on the face, as [one] might see in suffocation or strangulation events, because [one would] get restriction of the blood flowing back from the head to the heart, so those blood vessels, their blood pressure increases and they burst." Dr. Kissoon testified that her examination of C.D.L. at the hospital included "head to toe looking at all of the skin, all of the

body parts, listening to heart, lungs, eyes, ears, in the mouth, all of the things," "turn[ing] him over, pick[ing] him up, do[ing] like a normal physical exam that we would do." She noted that at the time of examination, C.D.L. had a cast on his leg and a bruise on his right eyelid, which in addition to the imaging raised concerns for physical abuse.

Dr. Kissoon testified that as part of her assessment, she interviewed both Mother and Father at the hospital about the events leading up to C.D.L.'s hospitalization. She asked them "about any other trauma just generally, any motor vehicle collisions, [and] any accidental drops or falls." Dr. Kissoon agreed that hugging a child that age too tightly could result in those types of injuries and that there is not a way to determine whether these injuries were either intentional or accidental. Dr. Kissoon testified that Mother had told her about the "new walker in the home" that C.D.L. used. Mother said that "it was too tall," "his legs were dangling," and the "walker" "needed to be notched down." Dr. Kissoon testified that Mother reported she "was not present when the walker was notched down but did hear [C.D.L.] cry from the other room. And then either the next day or several days later noted that he was having swelling and was not using that leg." Dr. Kissoon testified that Mother "also talked about there being previous episodes of seemingly [C.D.L.] being in pain and not moving an arm or a leg." Mother also reported C.D.L. "having spots on his—red spots on his face and some type of redness in the whites of his eyes." According to Dr. Kissoon, the "history from [Father] was similar with the walker incident," but the "dates were a little bit different of when . . . the incident with notching down the walker actually happened." She testified that Father also "talked about previous incidents of [C.D.L.] not using his arms or his leg, as well as having the red spots and the redness in the whites of his eyes." "Father also described two falls while he was holding [C.D.L.] that occurred on the same day," which Dr. Kissoon believed was August 31, 2021. Dr. Kissoon testified that Father said that the first fall occurred when he was going downstairs and fell backwards. Father said that C.D.L. did not fall out of his arms. Father

said the other fall occurred when he tripped on an object on the floor. Father said that C.D.L. did not fall out of his arms the second time either, but his glasses did hit C.D.L. in the face, which Father believed may have resulted in C.D.L. having a bruise on his face. Dr. Kissoon testified that C.D.L. was not taken for medical attention after these two falls. Dr. Kissoon testified that the parents reported "intermittent times for several months where [C.D.L.] did not use an arm or leg, or seemed to be in pain," for which the parents had been giving C.D.L. Tylenol. Dr. Kissoon testified that the parents said they had addressed the issue of C.D.L. not using his legs or arms with the pediatrician; however, Dr. Kissoon noted that those parental concerns were not reflected in the medical records.

Petitioner's Exhibit 6, the hospital's medical evaluation and assessment of C.D.L., which contained the medical history as provided by Mother and Father, was received into evidence without objection. Petitioner's Exhibit 7, the hospital's medical consult notes (including the notes made by Dr. Kissoon), were also admitted in evidence without objection. Dr. Kissoon testified that the medical records did not note any medical explanation for the fractures and breaks suffered by C.D.L. Dr. Kissoon testified that the explanations provided by the parents were not consistent with the injuries suffered by C.D.L. Dr. Kissoon testified that her "assessment was that these injuries were concerning for physical abuse." When asked what she meant by "concerning for physical abuse," Dr. Kissoon explained that the medical providers and physicians at the hospital "had looked for underlying medical problems," had spoken with the family to ask about any possible trauma that could have caused the injuries, and had "looked for any underlying medical causes that would cause these injuries to occur with minor trauma or with normal care and handling of an infant." Dr. Kissoon testified, "We did not find anything." Therefore, her assessment was C.D.L.'s "injuries were concerning for physical abuse."

Dr. Kissoon testified that C.D.L. had at least twenty rib fractures, "all of which [were] in different stages of healing." The rib fractures were found on the front and on the side of the ribs, which could have occurred from "squeezing of the chest" or direct impact to that area. Dr. Kissoon also testified that C.D.L. had "shaft fractures" of the clavicle, the right upper arm, both bones in the left forearm, and the right lower leg. Dr. Kissoon testified that all of those fractures "were in stages of healing" when first seen on the x-rays performed by the hospital. Dr. Kissoon testified that C.D.L. also had "long bone metaphyseal lesions," which are "fractures through the growth plate at the end of the long bone." Those fractures "are caused by a pulling, yanking and twisting movement." Dr. Kissoon testified that fractures were also noted "at the top end of the right upper arm, at the elbow end of the right upper arm, at both of the knee end of the thigh bone or femur," "at the ends of the right—right side bone of the lower leg," and "on the left side of the—in the lower leg at the knee end of that bone up there." Dr. Kissoon testified that like the long bone fractures, these fractures were also in different stages of healing, meaning that they occurred at different times.

Dr. Kissoon testified that injuries occurring at different times are concerning for physical abuse because there was no history of multiple accidents to explain the injuries. Dr. Kissoon testified, "A normal care and handling of a child should not result in multiple injuries over and over again." In describing the significance of classic metaphyseal lesions, Dr. Kissoon explained that these

> are fractures at the end of the long bone that go through the growth plate. They are significant because medical literature shows us that the[y are] not fractures that happen from accidental causes. They have a very specific mechanism of a pulling and twisting motion of the ends of those long bones, and they are highly specific for child physical abuse.

Dr. Kissoon testified that the repeated falls described by Father could not have caused C.D.L.'s injuries. She also testified that the only determination of the age of the fractures she could make was that they "happened at least seven to ten days prior to that imaging being done."

Dr. Kissoon testified she had recommended testing for the two most common genes present in osteogenesis imperfecta (OI); those tests returned with a negative result. She agreed that some bone disorders can mimic child abuse and that a number of metabolic bone disorders were not tested in this case. Dr. Kissoon testified that some of these disorders are more prevalent in infancy, and if treated may reduce in severity over the years. When asked about the possibility of "McCune Albright Syndrome," a metabolic bone disorder, Dr. Kissoon responded that there were no abnormalities on the imaging besides the fractures that would have indicated the presence of that disorder. Dr. Kissoon also agreed that it is possible for someone to test negative for OI and still have OI. She testified that for this reason, a follow up skeletal survey, which is the x-ray of all the bones of the body, was performed several months after C.D.L. had been removed from his parents' care. According to Dr. Kissoon, she wanted to see if there were any new fractures with normal care and handling. She explained that C.D.L. having no new fractures with normal care and handling would "decrease[] the likelihood that he has an underlying metabolic bone disease" causing fractures. Dr. Kissoon testified that C.D.L. was seen in the clinic on November 29, 2021 and again on February 8, 2022, and no new injuries of any kind were found.

State's Exhibit 8 was admitted into evidence without objection. The exhibit was a follow up February 8, 2022 evaluation performed on C.D.L., which showed no evidence of any new breaks or fractures to C.D.L.

Vickie Caylor, Mother's therapist, testified that she had been seeing Mother since November 27, 2021. Caylor testified it was her understanding that the issues and concerns causing Mother to be referred to her by the Department were C.D.L. suffering from multiple fractures in

various stages of healing and no one knew what happened. Caylor understood that what needed to be addressed were the cause of the injuries and Mother's protective capacity. Caylor testified that some of the theories Mother provided for C.D.L.'s injuries were "that her spouse had fallen down the stairs with the child in his arms, something may have happened in utero, and a bouncy seat." When discussing the fractures being in various stages of healing which indicated they could not have happened in one incident, Caylor testified Mother would acknowledge this fact and accept it "to a degree." However, Mother had no alternate plans for C.D.L.'s safety and security. Caylor testified that for the most part, Mother was consistent with her therapy, although there was a short period in which she was discharged for a missed session, but Mother eventually reengaged. Although Caylor characterized Mother as being actively engaged in therapy, she explained that Mother had "a really hard time understanding that her child was harmed seriously and it could have been a lot worse than it was." Caylor testified that Mother also acknowledged that the incident in which Father fell down the stairs with C.D.L. was not a viable explanation because C.D.L.'s injuries were in various stages of healing. Caylor testified that Mother was unable to provide any alternative person or incident that caused C.D.L.'s injuries or provide a plan to prevent C.D.L. from future injuries. According to Caylor, the best Mother could do was acknowledge that C.D.L. was hurt.

Caylor testified that she had no reason to doubt that Mother did not know what happened. Caylor described Mother's theories about possible situations that could have caused harm to C.D.L. as more of "grasping at straws." Although Caylor expressed it might be in C.D.L.'s best interest to reunify with Mother, Caylor testified she still had concerns because Mother did not know what happened to C.D.L. When asked whether she had an opinion about whether Mother's rights should be terminated, Caylor stated, "That's not for me to say. That would be up to the judge. I'm just concerned about risk." Caylor testified that in her opinion, Mother puts Father

before C.D.L. Caylor testified she was bothered by C.D.L. having "had over thirty fractures in various stages of healing," because his injuries "didn't happen just falling down the stairs," they "didn't happen in a bouncy chair," and they "did not happen in utero." Caylor testified, "There were various occasions where someone was harming this kid." Under cross-examination, Caylor conceded that she did not know whether more than one incident occurred or whether someone was harming C.D.L.

Caylor testified that after many months of therapy, Mother had not been able to "acknowledge it or deal with it, or figure out [and] protect C.D.L." According to Caylor, it would have helped for Mother to "separate or leave Father in order to show accountability and responsibility in that she [was] putting her son before her husband." Caylor testified that Mother did not satisfactorily address the issues relating to C.D.L.'s injuries, which was the reason she was referred to Caylor for counseling.

Tricia Boone, Father's clinical therapist, began treating Father in December 2021. Father was referred by the Department due to injuries to C.D.L. Boone testified that she received the removal affidavit and was familiar with the Department's concerns relating to C.D.L.'s unexplained injuries and fractures. Boone was aware that at the time of the injuries, C.D.L.'s primary caregivers were Mother and Father. Boone testified that she and Father mainly discussed the unexplained injuries and his relationship with Mother. According to Boone, when Father showed to his appointments, he was very engaged. Boone testified that Father initially started off well but had a pattern of missing an appointment and not reappearing for "six weeks or so." This on and off style of therapy was not considered to be engaging. Boone testified that according to Father, he had "a whole disk taken out L4 and 5 and that he had multiple vertebrae where the disks are – there is no disk in between the vertebrae and that he has permanent nerve damage from the waist down and that his legs go out quite frequently and he falls." Father described to Boone an

incident in which he was "walking down the stairs, and he couldn't tell if he missed a step or his legs just went out, but he did fall, and he said it was a pretty nasty fall." Father was holding C.D.L. at the time, but said "he sustained most of the injuries from that fall." Father also relayed to Boone a second incident in which either Father or C.D.L. "dropped a pacifier, and Father stepped on the pacifier and lost his footing while holding [C.D.L.] and hit the couch and the bouncy and the floor while . . . holding C.D.L. to his chest." Father said C.D.L. grabbed his glasses, which "were stacked between Father's chest and . . . C.D.L.'s cheek, and the glasses were broken."

Boone testified that Father's plan to prevent future injuries to C.D.L. was to stop carrying him. Father said C.D.L. was walking now and did not need to be carried. Father also planned to be "hyperalert if his legs were going to give out." Boone testified that in her twenty-five years of being a licensed professional counselor, she had seen thousands of clients and had "no reason to disbelieve that Father was being forthcoming and truthful with her." Boone testified that from her conversations with Father, she believed that he cared and loved his child, and would be a protective father. Based on what she knew of Father, Boone did not believe C.D.L. was at risk with him. She found Father to be sad about being separated from C.D.L. Boone was aware that the goal in this case was termination due to the number of unexplained fractures.

Edward Vela is a master investigator with the Department with special training in substance abuse, domestic violence, and trauma informed care. Vela was the primary investigator assigned to the case from its inception in November 2021 until late February to early March 2022. Vela testified he became involved in this case because of C.D.L. being hospitalized with several broken bones. He interviewed the parents during his investigation and testified that neither parent provided an explanation of C.D.L.'s injuries. According to Vela, the parents informed him that Father was C.D.L.'s primary caregiver and that there was another twelve-year-old daughter living in the home. He also spoke with the twelve-year-old daughter, grandparents, and several other more distant

family members. None of the family members could provide a reason for C.D.L.'s injuries. Vela testified that the Department moved for temporary managing conservatorship of C.D.L. because of the long list of injuries he sustained with no explanation for how those injuries occurred. Thus, the Department felt C.D.L. could not be returned to the parents' custody. Vela testified that based on his investigation, he believed there was an immediate danger to C.D.L.'s health and safety of C.D.L. and thus removal was necessary.

Joseph Ibanez was the Department's conservatorship caseworker and was tasked with sending referrals for services for the children and for the parents involved in this legal case, as well as following up with any kind of service providers, gathering any documentation that is received from those service providers, and maintaining regular contact with the family, and especially the children. Ibanez testified that in determining a family plan of service, he collaborates with the family and also adds services based on "whatever issues or concerns brought the family to have their child(ren) brought into foster care." According to Ibanez, at the time of trial, the parents had not completed their family service plans because they had not provided a "credible explanation for the injuries that C.D.L. sustained which brought him into foster care." The Department's concerns about returning C.D.L. to his parents were that "since there hasn't been a . . . credible explanation provided [to explain the injuries to C.D.L.], there is that present danger that this child may receive additional harm if returned to the home." Since January 2022, C.D.L. had been placed with Mother's cousin O.L. and her husband. Ibanez testified that the placement was meeting all C.D.L.'s needs, C.D.L. was doing very well, and the placement was safe, appropriate, and the least restrictive environment. Because C.D.L. was placed with relatives, Ibanez was able to visit with other family members. She testified the permanency goal was adoption by the placement. Ibanez testified that he believed it was in C.D.L.'s best interest to remain with the placement because of

(1) the time C.D.L. has spent with O.L. and her husband, (2) O.L. and her husband being family, and (3) the circumstances of the case.

### 2. Analysis

As noted, Mother and Father argue there is legally insufficient evidence to support the trial court's findings that they endangered C.D.L. for purposes of subsections (D) and (E). Under our standard of review, we look at all the evidence in the light most favorable to the trial court's endangerment finding. *See In re J.O.A.*, 283 S.W.3d at 344. Further, we are mindful that under our standard of review, the trial court, as factfinder, is the sole judge of the weight and credibility of the evidence. *See id*. at 346. Thus, the trial court was free to have not believed Mother's and Father's testimony that they did not know how C.D.L. sustained the numerous injuries in various stages of healing. *See id*. The trial court was also free to disbelieve Father's explanation that the two falls he had while carrying C.D.L. were the reason for C.D.L.'s injuries and both parents' explanation that the bouncy seat could have caused C.D.L.'s injuries. *See id*.

As factfinder, the trial court could give more weight to medical testimony in this case that C.D.L. had numerous fractures in different stages of healing that were not consistent with the parents' explanation and consistent with physical abuse. *See In re L.M.M.*, 522 S.W.3d at 45; *In re E.A.R.*, 583 S.W.3d at 908, 912. The trial court could have also relied on evidence that genetic testing had come back negative for any medical explanation for C.D.L.'s injuries. Additionally, the trial court could have relied on evidence that the parents were the primary caregivers during the period of time C.D.L. was injured multiple times and that C.D.L. has not suffered any new injuries following his removal from the parents' care. *See In re J.P.B.*, 180 S.W.3d at 574. From all this evidence, the trial court could have reasonably inferred that the parents endangered C.D.L. for purposes of subsections (D) and (E). Therefore, we hold the evidence is legally sufficient to

support the trial court's endangerment finding under both subsections (D) and (E). *See In re D.P.*, 2022 WL 2975691, at \*9-10.

Further, with regard to factual sufficiency, Mother and Father point to their testimony at trial that they did not cause C.D.L.'s injuries and that they properly cared for C.D.L. by taking him to appointments with his pediatrician, by pointing out possible concerns they had with C.D.L.'s heath, and by taking him to the emergency room. However, in considering this disputed evidence, we cannot conclude in light of the entire record that this disputed evidence was so significant that the trial court could not have reasonably formed a firm belief or conviction that its endangerment finding was true. *See In re J.O.A.*, 283 S.W.3d at 345. Thus, we hold the evidence is also factually sufficient to support the trial court's endangerment finding under subsections (D) and (E). *See In re D.P.*, 2022 WL 2975691, at \*10.[3]

### C. Best Interest

Mother and Father both argue the evidence is legally and factually insufficient to support the findings that termination of their parental rights is in the best interest of C.D.L. *See* TEX. FAM. CODE § 161.001(b)(2); *In re J.O.A.*, 283 S.W.3d at 344-45 (explaining legal and factual sufficiency standards). There is a strong presumption that the best interest of a child is served by keeping the child with a parent. *In re R.R.*, 209 S.W.3d 112, 116 (Tex. 2006). In determining whether the child's parent is willing and able to provide the child with a safe environment, the trial court should consider the relevant factors set out in section 263.307. *See* TEX. FAM. CODE § 263.307(b).[4] In

---

[3]We note that having determined there is legally and factually sufficient evidence to support the trial court's findings under subsections (D) and (E), we need not reach Mother's and Father's issues regarding whether there was legally and factually sufficient evidence to support termination under subsection (O) grounds. *See In re D.J.H.*, 381 S.W.3d 606, 611-12 (Tex. App.—San Antonio 2012, no pet.) (explaining that when the trial court terminates the parent-child relationship on multiple grounds, the court of appeals may affirm on any one ground because, in addition to finding that termination is in the child's best interest, only one predicate violation under section 161.001(1) is necessary to support a termination decree).

[4]These factors include (1) the child's age and physical and mental vulnerabilities; (2) the frequency and nature of out-of-home placements; (3) the magnitude, frequency, and circumstances of the harm to the child; (4) whether the child

addition to these statutory factors, in considering the best interest of the child, a factfinder may also consider the nonexclusive list of factors set forth by the Texas Supreme Court in *Holley v. Adams*, 544 S.W.2d 367, 371-72 (Tex. 1976).[5] The *Holley* factors are neither all-encompassing nor does a court need to find evidence of each factor before terminating the parent-child relationship. *In re C.H.*, 89 S.W.3d 17, 27 (Tex. 2002); *see In re E.A.R.*, 672 S.W.3d 716, 722 (Tex. App.—San Antonio 2023, pet. denied) (noting that a best-interest finding does not require proof of any particular factor). "Evidence of a single factor may be sufficient for a factfinder to form a reasonable belief or conviction that termination is in the child's best interest." *In re E.A.R.*, 672 S.W.3d at 722 (quoting *In re J.B.-F.*, No. 04-18-00181-CV, 2018 WL 3551208, at *3 (Tex. App.—San Antonio July 25, 2018, pet. denied)). Finally, in determining whether termination of the parent-child relationship is in the best interest of a child, a factfinder may also judge a parent's future conduct by her past conduct. *In re E.A.R.*, 672 S.W.3d at 722; *In re E.D.*, 419 S.W.3d 615,

---

has been the victim of repeated harm after the initial report and intervention by the Department; (5) whether the child is fearful of living in or returning to the child's home; (6) the results of psychiatric, psychological, or developmental evaluations of the child, the child's parents, other family members, or others who have access to the child's home; (7) whether there is a history of abusive or assaultive conduct by the child's family or others who have access to the child's home; (8) whether there is a history of substance abuse by the child's family or others who have access to the child's home; (9) whether the perpetrator of the harm to the child is identified; (10) the willingness and ability of the child's family to seek out, accept, and complete counseling services and to cooperate with and facilitate an appropriate agency's close supervision; (11) the willingness and ability of the child's family to effect positive environmental and personal changes within a reasonable period of time; (12) whether the child's family demonstrates adequate parenting skills, including providing the child and other children under the family's care with: (A) minimally adequate health and nutritional care; (B) care, nurturance, and appropriate discipline consistent with the child's physical and psychological development; (C) guidance and supervision consistent with the child's safety; (D) a safe physical home environment; (E) protection from repeated exposure to violence even though the violence may not be directed at the child; and (F) an understanding of the child's needs and capabilities; and (13) whether an adequate social support system consisting of an extended family and friends is available to the child. TEX. FAM. CODE § 263.307(b).

[5]These factors include, but are not limited to, the following: (1) the child's desires; (2) the child's present and future emotional and physical needs; (3) any present or future emotional and physical danger to the child; (4) the parental abilities of the individuals seeking custody; (5) the programs available to assist these individuals to promote the child's best interest; (6) the plans for the child by these individuals or by the agency seeking custody; (7) the stability of the home or proposed placement; (8) the parent's acts or omissions that may indicate the existing parent-child relationship is improper; and (9) any excuse for the parent's acts or omissions. *In re E.C.R.*, 402 S.W.3d 239, 249 n.9 (Tex. 2013) (citing *Holley*, 544 S.W.2d at 371-72).

620 (Tex. App.—San Antonio 2013, pet. denied). The predicate grounds for termination may also be probative of best interest. *In re C.H.*, 89 S.W.3d at 28; *In re E.A.R.*, 672 S.W.3d at 722.

Mother and Father both argue there is legally and factually insufficient evidence to support the best-interest findings because there is insufficient evidence that they endangered C.D.L. or knowingly placed him with persons who endangered C.D.L. However, we have held that there is legally and factually sufficient evidence to support the trial court's endangerment findings under subsections (D) and (E). Thus, the subsection (D) and (E) predicate grounds may be probative of C.D.L.'s best interest. *See In re E.A.R.*, 672 S.W.3d at 722.

At the time of trial, the Department's goal for permanency was relative adoption by the current placement, Mother's cousin O.L. and husband. The evidence showed that C.D.L. has no special needs. He was doing well with the placement, his needs were being met, he appeared to be developmentally on-target, and his follow up skeletal surveys and medical visits showed no signs of further injury.

Mother and Father point to evidence that during the weekly supervised visitations throughout the suit, C.D.L. appeared to be bonded to them and there were no concerns. They also point to having completed services on their family service plan, including having stable employment and housing. They argue that there is no evidence they are unable or unwilling to meet C.D.L.'s emotional or physical needs or provide him with a safe and stable home. Of course, this argument fails to address the evidence presented at trial with regard to endangerment under subsections (D) and (E). Given the evidence noted above that supported the trial court's endangerment findings under subsections (D) and (E), and the evidence that C.D.L. is doing well in his current placement, we hold the evidence is legally and factually sufficient to support the trial court's best-interest findings. *See In re E.A.R.*, 672 S.W.3d at 722-24.

**INEFFECTIVE ASSISTANCE OF COUNSEL**

Finally, Father argues that he received ineffective assistance of counsel because his appointed counsel did not conduct discovery or attempt to secure an expert witness to counter the claims made at trial by Dr. Kissoon. To successfully raise an ineffective assistance of counsel claim in a parental-termination case, a parent must meet the United States Supreme Court's two-prong test set out in *Strickland v. Washington*, 466 U.S. 668, 687 (1984). *See In re D.T.*, 625 S.W.3d 62, 73 (Tex. 2021). Under that standard, a parent appealing a termination order must show by a preponderance of the evidence his "trial counsel's performance fell below an objective standard of reasonableness" and he was "prejudiced by trial counsel's defective performance." *In re J.A.B.*, 562 S.W.3d 726, 729 (Tex. App.—San Antonio 2018, pet. denied) (citing *Strickland*, 466 U.S. at 687). "In determining whether counsel's performance fell below an acceptable level, we 'give great deference to counsel's performance, indulging a strong presumption that counsel's conduct falls within the wide range of reasonable professional assistance, including the possibility that counsel's actions are strategic.'" *In re J.C.H.-P.* 673 S.W.3d 262, 265 (Tex. App.—San Antonio 2023, no pet.) (quoting *In re J.M.O.*, 459 S.W.3d 90, 93 (Tex. App.—San Antonio 2014, no pet.)). "It is only when 'the conduct was so outrageous that no competent attorney would have engaged in it,' that the challenged conduct will constitute ineffective assistance." *In re M.S.*, 115 S.W.3d 534, 545 (Tex. 2003) (quoting *Garcia v. State*, 57 S.W.3d 436, 440 (Tex. Crim. App. 2001)). "[T]o show prejudice, an appellant must show that there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceeding would have been different." *In re J.M.O.*, 459 S.W.3d at 94 (citation omitted). "A failure to establish either prong of the *Strickland* test is fatal to an ineffective assistance claim." *In re J.R.R.*, No. 04-22-00076-CV, 2022 WL 3047099, at *2 (Tex. App.—San Antonio 2022, no pet.).

Even if we were to assume appointed counsel was deficient, Father has made no showing of prejudice in this case. Father did not file a motion for new trial in this case or otherwise produce evidence in support of his ineffective counsel claim. The record is silent as to why appointed counsel did not conduct the discovery in question or secure an expert witness. It is possible no expert witness would contradict Dr. Kissoon's testimony. Thus, Father has made no showing that had his appointed counsel conducted discovery or secured an expert witness, the result of this proceeding would have been different. *See In re A.M.R.*, 652 S.W.3d 117, 129 (Tex. App.—Waco 2022, pet. denied) (holding appellant had not shown that but for the alleged error by appointed counsel, the result of the proceeding would have been different).

## CONCLUSION

For the reasons stated above, we hold the evidence is legally and factually sufficient to support the trial court's (D) and (E) predicate findings and the trial court's best-interest findings. We further hold that Father has not met his burden of showing he was deprived effective assistance of counsel. Therefore, we affirm the trial court's order terminating Mother's and Father's parental rights.

Liza A. Rodriguez, Justice